**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

ANDREW E. ROTH,

Plaintiff,

-v-

ANSON FUNDS MANAGEMENT LP, ANSON ADVISORS INC., ANSON INVESTMENTS MASTER FUND LP, ANSON EAST MASTER FUND LP, AIMF GP LLC, AEMF GP LLC, ANSON MANAGEMENT GP LLC, 1737403 ONTARIO INC., 2614297 ONTARIO INC., TONY MOORE, MOEZ KASSAM, and AMIN NATHOO

Defendants,

and

SELLAS LIFE SCIENCES GROUP, INC.,

Nominal Defendant.

26 Civ. 10011

*(Jury Trial Demanded)*

**COMPLAINT**

## TABLE OF CONTENTS


INTRODUCTION (¶¶ 1-9) ..... 1

THE PARTIES (¶¶ 10-23) ..... 5

JURISDICTION AND VENUE (¶ 24) ..... 9

THE GOVERNING LAW (¶¶ 25-36) ..... 9

A. Section 16(b) (¶¶ 25-27) ..... 9

B. Beneficial Ownership Under Section 16(b) (¶¶ 28-30) ..... 10

1. Section 13(d) / SEC Rule 13d-3 Beneficial Ownership (¶¶ 31-36) ..... 11

THE BLOCKER PROVISIONS IN THE WARRANTS HAVE NO EFFECT ON THE BENEFICIAL OWNERSHIP DETERMINATION UNDER RULE 13d-3(d)(1)(i) (¶¶ 37-42) ..... 13

THE ANSON FUNDS ARE A SECTION 16(b) Group (¶¶ 43-45) ..... 16

THE ANSON DEFENDANTS' CONTROL PURPOSE OR EFFECT (¶¶ 46-55) ..... 17

THE EQUITY TRANSACTIONS AND SELLAS' FINANCIAL DISTRESS (¶¶ 56-81) ..... 22

A. The Anson Funds' Equity Transactions, Sales of Common Stock, and Beneficial Ownership (¶¶ 56-73) ..... 22

- Transaction 1 (¶ 56) ..... 22
- Beneficial Ownership After Transaction 1 (¶ 57) ..... 23
- Beneficial Ownership As of 6/30/2024 (¶ 58) ..... 23
- Transaction 2 (¶ 59) ..... 24
- Beneficial Ownership After Transaction 2 (¶ 60) ..... 25
- Beneficial Ownership As of 12/31/2024 (¶ 61) ..... 25
- Transaction 3 (¶ 62) ..... 26
- Beneficial Ownership After Transaction 3 (¶ 63) ..... 26
- Beneficial Ownership As of 8/11/2025 (¶ 64) ..... 27

- Transaction 4 (¶¶ 65) ..... 27
- Beneficial Ownership After Transaction 4 (¶ 66) ..... 28
- Beneficial Ownership As of 9/30/2025 (¶ 67) ..... 29
- Transaction 5 (¶ 68) ..... 29
- Beneficial Ownership After Transaction 5 (¶ 69) ..... 30
- Beneficial Ownership As of 12/31/2025 (¶ 70) ..... 31
- Beneficial Ownership As of 3/31/2026 (¶ 71) ..... 31
- Greater Than 10% Beneficial Ownership From 3/15/2024 to 3/31/2026 (¶¶ 72-73) ..... 32

B. SELLAS' Financial Distress (¶¶ 74-81) ..... 33

THE ANSON FUNDS OBSCURED THEIR PARTICIPATION IN THE EQUITY TRANSACTIONS (¶¶ 82-88) ..... 35

THE ANSON DEFENDANTS' SHORT-SWING TRANSACTIONS (¶¶ 89-99) ..... 38

A. Short-Swing Profit Transactions Set 1 (¶¶ 90-93) ..... 39

B. Short-Swing Profit Transactions Set 2 (¶¶ 94-96) ..... 40

C. The Anson Funds' Beneficial Ownership in the Transactions Sets (¶¶ 97-99) ..... 41

ALLEGATIONS AS TO THE DEMAND (¶ 100) ..... 41

AS AND FOR A FIRST CLAIM FOR RELIEF AGAINST THE ANSON FUNDS AS A GROUP (¶¶ 101-104) ..... 42

IN THE ALTERNATIVE, AS AND FOR A SECOND CLAIM FOR RELIEF AGAINST AIMF (¶¶ 105-108) ..... 42

IN THE ALTERNATIVE, AS AND FOR A THIRD CLAIM FOR RELIEF AGAINST AEMF (¶¶ 109-112) ..... 43

IN THE ALTERNATIVE, AS AND FOR A FOURTH CLAIM FOR RELIEF AGAINST THE ANSON DEFENDANTS (¶¶ 113-115) ..... 44

EXHIBIT 1 Chart showing the organization of the Anson Defendants ..... TAB 1

EXHIBIT 2 Texas Comptroller Franchise Tax Account Status Report Dated November 6, 2026 for AIMF GP LLC ............................................... TAB 2

EXHIBIT 3 Texas Comptroller Franchise Tax Account Status Report Dated November 5, 2026 for AEMF GP LLC.............................................. TAB 3

EXHIBIT 4 Texas Comptroller Franchise Tax Account Status Report Dated Nov. 5, 2026 for Anson Management GP LLC ..................................TAB 4

EXHIBIT 5 Ontario Profile Report for 1737403 Ontario Inc. as of September 30, 2026...................................................................TAB 5

EXHIBIT 6 Ontario Profile Report for 2614297 Ontario Inc. as of September 30, 2026...................................................................TAB 6

EXHIBIT 7 Analysis Showing Short-Swing Profits for Short-Swing Transactions Set 1 ......................................................TAB 7

EXHIBIT 8 Analysis Showing Short-Swing Profits for Short-Swing Profit Transactions Set 2..........................................................TAB 8

Plaintiff Andrew E. Roth ("Roth"), by his undersigned attorneys, alleges upon information and belief as to all paragraphs except paragraph 10, as follows:

## INTRODUCTION

1. Roth brings this action on behalf of Nominal Defendant SELLAS Life Sciences Group, Inc. ("SELLAS" or the "Company") to obtain disgorgement of "short-swing" profits in an amount presently estimated to be not less than $54,749,932.28 and up to $165,907,405.23 or such greater amount as is proven at trial, realized by the Defendants (collectively referred to herein as the "Anson Defendants") from purchases and sales of the Company's common stock, par value $0.0001 per share ("Common Stock"), and derivative securities related to the Company's Common Stock, in violation of Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b) ("§16(b) or Section 16(b)").

2. Section 16(b) imposes liability on an issuer's directors, officers, and shareholders beneficially owning greater than 10% of a registered class of an issuer's equity securities ("statutory insiders"), requiring them to disgorge to the issuer any profits they realize from "any purchase and sale, or any sale and purchase" of an issuer's equity securities "within any period of less than six months" ("short-swing transactions").

3. Between March 15, 2024 and October 24, 2025 – a period during which SELLAS made recurring Securities and Exchange Commission ("SEC") disclosures that there was substantial doubt about its ability to continue as a going concern – the Anson Defendants executed five equity financing transactions with the Company in which Anson Investments Master Fund LP ("AIMF") and Anson East Master Fund LP ("AEMF" and together with AIMF, the "Anson Funds") acquired Common Stock, together with pre-funded warrants, common warrants, and inducement warrants (collectively, "Warrants") exercisable for the Company's

Common Stock (the "Equity Transactions").[1] In each Equity Transaction, the Anson Funds acted as the sole or, in one transaction, 50% investor, and each Equity Transaction imposed covenants restricting the Company's ability to conduct subsequent equity financings and/or variable-rate transactions with other investors during specified restricted periods.

4. Based upon publicly-available information, the Equity Transactions enabled the Anson Funds to acquire shares of Common Stock and exercise the Warrants for an aggregate of approximately 122.1 million shares and sell substantially all of those shares (approximately 117.6 million shares through June 30, 2026) into the public market — with the 122.1 million acquired shares representing approximately 60.5% of the Company's outstanding Common Stock as of June 30, 2026 (and the 117.6 million shares sold representing approximately 58.2% of the Company's outstanding Common Stock as of June 30, 2026)[2] — while ensuring that, during each successive restricted period, the Company could not seek alternative financing sources from other investors.

5. Each of the Warrants included "blockers," amendable only on sixty-one (61) days' prior notice, that prevented the Anson Funds from exercising the Warrant to the extent that their beneficial ownership (combined with the beneficial ownership of affiliates and group members) of Common Stock after exercise would be greater than 4.99% or 9.99% of the Company's

---

[1] Unless otherwise noted, all documents cited in this Complaint are publicly available on the SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, available at https://www.sec.gov/search-filings. A court may consider documents incorporated into a complaint by reference and legally required public disclosure documents filed with the SEC. See *Vekaria v. Mthree Corp. Consulting, Ltd.*, No. 22 Civ. 3197 (JPC)(JLC), 2023 WL 6387275, at *1, note 1 (S.D.N.Y. Sept. 30, 2023), citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007).

[2] The Company's SEC Form 10-Q for the quarter ending June 30, 2026 (filed Aug. 11, 2026) ("SELLAS Form 10-Q (2Q 2026)") at p. 4 reports that as of June 30, 2026, SELLAS had outstanding 201,918,874 shares of Common Stock.

outstanding shares of Common Stock. The blockers purported to place a cap on the Anson Funds' beneficial ownership at less than 5% or 10% to avoid the Anson Defendants triggering SEC Regulation 13D-G and 17 CFR § 240.16-a3, ("Rule 16a-3") reporting requirements, and liability under Section 16(b) for the Anson Funds' short-swing transactions in SELLAS equity securities.

6. But the blockers did not, and could not, limit the Anson Funds' beneficial ownership under SEC Rule 13d-3(d)(1)(i), 17 C.F.R. §240.13d-3(d)(1)(i) ("Rule 13d-3(d)(1)(i)"). Instead, the blockers only served to limit the Anson Funds' ability to exercise the Warrants at any given time and only excluded beneficial ownership of shares for the singular purpose of determining the number of shares for which the Warrants could be exercised at **any given time**. In fact, the Anson Funds acquired every share underlying the Warrants, with the exception of approximately 4.1 million Warrant shares that had remained unexercised as of June 30, 2026.

7. Under the definition of "beneficial owner" in Rule 13d-3(d)(1)(i), the Anson Funds had beneficial ownership of all shares of Common Stock which could be acquired under the Warrants **at any time** because the Anson Funds acquired the Warrants with the "purpose or effect of changing or influencing the control of" SELLAS, evidenced by the following:

> (a) the Anson Funds acted as the sole or 50% source of the Company's equity financings during the relevant period, when the Company's ability to continue as a going concern depended on such financing;
>
> (b) the restrictive covenants in the Equity Transactions, combined with the successively increasing number of unexercised Warrants ("warrant overhang") held by the Anson Funds, effectively guaranteed that the Anson Funds were the Company's exclusive source of equity financing;
>
> (c) the magnitude of the Anson Funds' position (representing beneficial ownership of as high as approximately 49.3% of the outstanding Common Stock) gave the Anson Funds economic power over the Company;
>
> (d) the provisions of the Warrants gave the Anson Funds a put right to realize a substantial premium in the event of a change of control transaction, for all underlying Warrant shares, without regard to the blocker limitation, which

effectively assured that no change of control transaction could be completed without engaging in negotiations with the Anson Funds to agree on the consideration that the Anson Funds would receive in a change of control transaction; and

(e) other facts and circumstances, including the Anson Defendants' history of activism that further establishes the Anson Funds' acquisitions of the Warrants had the purpose or effect of changing or influencing the control of SELLAS.

8. As a consequence, under Rule 13d-3(d)(1)(i), the Anson Funds were beneficial owners of more than 10% of the Company's Common Stock for purposes of Section 16(b) and each of AIMF and AEMF was a statutory insider subject to SEC reporting requirements under Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a) ("Section 16(a)") and disgorgement of short-swing profits realized from its purchases and sales of the Company's equity securities. Each of the other Anson Defendants, through his or its control of the Anson Funds, shared voting and investment power over the shares beneficially owned by the Anson Funds and therefore was a greater than 10% beneficial owner, also subject to Section 16(a) reporting and disgorgement of short-swing profits to the extent of their respective pecuniary interests.

9. The Anson Defendants did not file SEC Forms 3 and 4 to report the Anson Defendants' beneficial ownership and changes in beneficial ownership as required by Section 16(a) and the SEC's rules promulgated thereunder. In addition, the Anson Defendants failed to file SEC Schedule 13D and amendments thereto to report their beneficial ownership and other information required by Section 13(d) of the Exchange Act, 15 U.S.C. §78m(d) ("Section 13(d)"). These actions by the Anson Defendants obscured their beneficial ownership and deprived the public markets of material information concerning their beneficial ownership.

## THE PARTIES

10. Plaintiff Roth is a New York resident who is, and at the time this action was commenced was, the owner of SELLAS Common Stock, and will continue to hold such stock through the pendency of this action.

11. Defendant Anson Funds Management LP ("Anson Management") is a Texas limited partnership that acts as a co-investment adviser to defendants AIMF and AEMF.[3] Anson Management's principal business address is located at 16000 Dallas Parkway, Suite 800, Dallas Texas 75248. A chart showing the organization of the Anson Defendants is annexed as **Exhibit 1**. Anson Management receives from its clients a management fee based on the client's net asset value. In addition, Anson Management and its affiliates receive performance-based allocation compensation ("performance fee") based on a percentage of each client's annual profits.[4] Anson Management also has a beneficial ownership interest in AIMF and AEMF.[5]

12. Defendant Anson Advisors Inc. ("Anson Advisors") is a corporation organized under the laws of Ontario, Canada that acts as a co-investment adviser to defendants AIMF and AEMF. Anson Advisors' principal business address is located at 181 Bay Street, Suite 4200, Toronto, Ontario M5J 2T3, Canada. Anson Advisors receives a portion of the management fees

---

[3] Anson Management, Form ADV Part 2A: Firm Brochure dated Mar. 31, 2026 ("Anson Management Brochure") at 5. The Brochure notes that "[s]ince our previous update to our Part 2A of Form ADV in February 2025, we have no material changes to our business…" *Id.* at p. 2. The Anson Management Brochure is publicly available at the SEC's Investment Adviser Public Disclosure website at https://adviserinfo.sec.gov.

[4] Anson Management Brochure at 5.

[5] Anson Management, Form ADV dated Mar. 31, 2026 ("Anson Management Form ADV") at 21 (AEMF - 13%) and 32 (AIMF - 30%). This Form ADV is publicly available at https://adviserinfo.sec.gov.

paid to Anson Management.[6] Anson Advisors also has a beneficial ownership interest in AEMF and AIMF.[7]

13. Defendant AIMF is a Cayman Islands exempted limited partnership with its legal address at c/o Maples Corporate Services Limited, Ugland House, South Church Street, P.O. Box 309, George Town, Grand Cayman, KY1-1104, Cayman Islands.[8] AIMF has two feeder funds, Anson Investments LP and Anson Investments Offshore Fund, Ltd.[9]

14. Defendant AEMF is a Cayman Islands exempted limited partnership with its legal address at c/o Maples Corporate Services Limited, Ugland House, South Church Street, P.O. Box 309, George Town, Grand Cayman, KY1-1104, Cayman Islands.[10] AEMF has two feeder funds, Anson East LP and Anson East Offshore Fund Ltd.[11]

15. Defendant AIMF GP LLC ("AIMF GP") is a Texas limited liability corporation with its principal place of business located at 16000 Dallas Parkway, Suite 800, Dallas Texas 75248.[12] AIMF GP is the general partner of AIMF and receives an allocation of the performance fee from AIMF.[13]

---

[6] Anson Management Brochure at 5.

[7] Anson Advisors Form ADV dated Mar. 3, 2026 ("Anson Advisors Form ADV") at 9 (AEMF - 13%) and 20 (AIMF-30%). This Form ADV publicly available at https://adviserinfo.sec.gov.

[8] Bloomberg Legal Entity Identifier (LEI) at *https://lei.bloomberg.com/leis/view/549300G00H67TILXH059* (Last visited on Nov. 11, 2026).

[9] Anson Management Form ADV at 30.

[10] Bloomberg Legal Entity Identifier (LEI) at *https://lei.bloomberg.com/leis/view/549300AHWL5KSQEXVM38* (Last visited on Nov. 11, 2026).

[11] Anson Management Form ADV at 19.

[12] Texas Comptroller Franchise Tax Account Status report dated Nov. 6, 2026 for AIMF GP LLC (**Exhibit 2**).

[13] Anson Management Form ADV at 30, Anson Management Brochure at 49.

16. Defendant AEMF GP LLC ("AEMF GP") is a Texas limited liability corporation with its principal place of business located at 16000 Dallas Parkway, Suite 800, Dallas Texas 75248.[14] AEMF GP is the general partner of AEMF and receives an allocation of the performance fee from AEMF.[15]

17. Defendant Anson Management GP LLC ("Anson GP") is a Texas limited liability company with its principal place of business located at 16000 Dallas Parkway, Suite 800, Dallas Texas 75248.[16] Anson GP is the general partner of Anson Management and has an interest in Anson Management's management and performance-based fees.[17]

18. Defendant 1737403 Ontario Inc. ("403 Ontario") is an Ontario Business Corporation with its principal place of business located at 181 Bay Street, Suite 4200, Toronto, Ontario, M5J2T3, Canada.[18] 403 Ontario is a 50% shareholder of Anson Advisors and has an interest in Anson Advisor's management fee.[19]

19. Defendant 2614297 Ontario Inc. ("297 Ontario") is an Ontario Business Corporation with its principal place of business located at 181 Bay Street, Suite 4200, Toronto, Ontario, MSJ2T3, Canada.[20] 297 Ontario is a 50% shareholder of Anson Advisors and has an interest in Anson Advisor's management fee.[21]

---

[14] Texas Comptroller Franchise Tax Account Status report dated Nov. 5, 2026 for AEMF GP LLC (**Exhibit 3**).

[15] Anson Management Form ADV at 19, Anson Management Brochure at 49.

[16] Texas Comptroller Franchise Tax Account Status report dated Nov. 5, 2026 for Anson Management GP LLC (**Exhibit 4).**

[17] Anson Management Brochure at 4; Anson Management Form ADV at 77.

[18] Ontario Profile Report for 1737403 Ontario Inc. as of Sept. 30, 2026 at p.1 (**Exhibit 5**).

[19] Anson Advisors Form ADV at 62.

[20] Ontario Profile Report for 2614297 Ontario Inc. as of Sept. 30, 2026 at p. 1 (**Exhibit 6**).

[21] Anson Advisors Form ADV at 62.

20. Defendant Tony Moore ("Moore") is a limited partner, the sole manager, managing member, Chief Financial Officer, Chief Compliance Officer, and principal owner of Anson GP. Moore is the principal owner (75% or greater) and Chief Compliance Officer of Anson Management. [22] Moore is also one of the two directors of the AIMF feeder fund Anson Investments Offshore Fund, Ltd. and the AEMF feeder fund Anson East Offshore Fund Ltd.[23] Moore has an interest in Anson Management's management fee and performance fee. Moore also has an indirect beneficial interest in AEMF and AIMF through Anson GP and Anson Management. See ¶ 11, footnote 5 *supra* and **Exhibit 1**.

21. Defendant Moez Kassam ("Kassam") is the President and Director of Anson Advisors.[24] Kassam is the Director, President, and Secretary of 403 Ontario.[25] Kassam is also the sole shareholder of 403 Ontario.[26] Kassam has an interest in Anson Advisors' management fee. Kassam also has an indirect beneficial ownership interest in AEMF and AIMF through 403 Ontario and Anson Advisors. See ¶ 12, footnote 7 *supra* and **Exhibit 1**.[27]

22. Defendant Amin Nathoo ("Nathoo") is the Chief Executive Officer, Chief Compliance Officer, Secretary, and Director of Anson Advisors.[28] Nathoo is the Director,

---

[22] Anson Management Brochure at p. 4, Anson Management Form ADV at 77, and Anson Management Schedule 13D (filed Jul. 9, 2024) at Item 2(c).

[23] Anson Advisors Form ADV at 20, 31.

[24] Anson Advisors Form ADV at 62.

[25] **Exhibit 5**.

[26] Anson Advisors Form ADV at 63.

[27] The Anson Fund's website describes Kassam as the co-founder, Chairman and Chief Investment Officer for Anson Funds. Anson Funds webpage "The Team," *https://ansonfunds.com/the-team/*. (Last visited on Nov. 11, 2026).

[28] Anson Advisors Form ADV at 62.

President, and Secretary of 297 Ontario.[29] Nathoo is also the sole shareholder of 297 Ontario.[30] Nathoo has an interest in Anson Advisors' management fee. Nathoo also has an indirect beneficial ownership interest in AEMF and AIMF through 297 Ontario and Anson Advisors. See ¶ 12, footnote 7 *supra* and **Exhibit 1**.

23. Nominal Defendant SELLAS is a Delaware corporation having its principal business address at 7 Times Square, Suite 2503, New York, New York 10036. The Common Stock trades on the Nasdaq stock exchange under the ticker symbol "SLS."

## JURISDICTION AND VENUE

24. This action is brought on behalf of SELLAS pursuant to Section 16(b). Jurisdiction of this Court and venue in this District are proper pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa in that Defendants transact business in this District, and certain of the acts underlying this action occurred in this District.

## THE GOVERNING LAW

### A. Section 16(b)

25. Section 16(b) provides that if a statutory insider purchases and sells or sells and purchases shares of any equity security of such issuer within a period of less than six months, any profits arising from those transactions are recoverable by the issuer or by a shareholder suing on its behalf.

26. Section 16(a) defines a "statutory insider" as "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security . . .

---

[29] **Exhibit 6**.

[30] Anson Advisors Form ADV at 63.

which is registered pursuant to section 12, or who is a director or an officer of the issuer of such security." 15 U.S.C. §78p(a)(1).

27. The express purpose of Section 16(b) is "preventing the unfair use of information which may have been obtained by such" statutory insiders. 15 U.S.C. § 78p(b). *Packer v. Raging Capital Management, LLC*, 105 F.4th 46, 53 (2d Cir. 2024); *Donoghue v. Bulldog Investors Gen. P'ship,* 696 F.3d 170, 176 (2d Cir. 2012); *Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 308 (2d Cir. 1998).

**B. Beneficial Ownership Under Section 16(b)**

28. The Exchange Act does not define the term "beneficial owner." Section 3(b) of the Exchange Act, 15 U.S.C. 78c(b), expressly authorized the SEC to adopt rules defining terms in the Exchange Act. In 1991, the SEC adopted two definitions of "beneficial owner."

29. The first definition of "beneficial owner," in SEC Rule 16a-1(a)(1), 17 C.F.R. 240.16a-1(a)(1) ("Rule 16a-1(a)(1)") applies "[s]olely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities" and defines "beneficial owner" as "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act [15 U.S.C. 78m(d)] and the rules thereunder."

30. Once status as a beneficial owner under Section 13(d) is determined, or if a person has insider status as an officer or director, the second definition in SEC Rule 16a-1 comes into play. The second definition of "beneficial owner," in SEC Rule 16a-1(a)(2), 17 C.F.R. 240.16a-1(a)(2), defines the term "beneficial owner" for purposes of reporting ownership transactions under Section 16(a) of the Exchange Act and for purposes of determining disgorgeable short-swing profits under Section 16(b) of the Exchange Act. For these purposes, a "beneficial owner" is "any person who, directly or indirectly, through any contract, arrangement,

understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities" of the issuer. The term "pecuniary interest" is defined as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 CFR § 240.16a-1(a)(2)(i).

**1. <u>Section 13(d) / SEC Rule 13d-3 Beneficial Ownership</u>**

31. SEC Rule 13d-3(a), 17 C.F.R. § 240.13d-3(a), defines a beneficial owner as "any person who, directly or indirectly… has or shares (1) voting power …. [or] (2) investment power."

32. Rule 13d-3(d)(1)(i) in a lead-in clause, provides further that a person is deemed the beneficial owner of a security if that person "has the right to acquire beneficial ownership of such security... within sixty days, including but not limited to any right to acquire: (A) [t]hrough the exercise of any option, warrant or right."

33. Rule 13d-3(d)(1)(i) continues with a proviso which states "provided, however, any person who acquires a security or power specified in [paragraph] (d)(1)(i)(A)... with the purpose or effect of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having such purpose or effect, immediately upon such acquisition shall be deemed to be the beneficial owner of the securities which may be acquired through the exercise or conversion of such security or power."

34. The proviso in Rule 13d-3(d)(1)(i) states that a person who acquires a warrant (i.e., "a security or power specified in paragraph (d)(1)(i)(A)") with a control purpose or effect (i.e., "with the purpose or effect of changing or influencing the control") immediately is deemed to be the beneficial owner of all underlying warrant shares (i.e., "the securities which may be acquired through the exercise or conversion of such security or power"). The SEC has

consistently interpreted the phrase "the securities which may be acquired through the exercise or conversion of such security or power" to mean "the underlying securities"[31] or the shares that may be acquired "regardless of when that right may be exercisable."[32]

35. The SEC has consistently interpreted Rule 13d-3(d)(1)(i) to vest immediate beneficial ownership **of all underlying shares which may be acquired through the exercise** of a right or power such as a warrant if the person acquires the right or power with the purpose or effect of changing or influencing control:

> Rule 13d-3(d)(1) provides that a person will be deemed to be a beneficial owner of equity securities if the person has the right to acquire beneficial ownership of the securities within 60 days, **or at any time if the right is held for the purpose of changing or influencing control**. …. When a right to acquire may be exercised within 60 days or less, **or** if a right has been acquired for the purpose or with the effect of changing or influencing control of the issuer of securities, we believe that **treating the holder of the right as if the person is a beneficial owner under Rule 13d-3(d)(1) is necessary to achieve the regulatory purpose of Section 13 given the person's potential to influence or change control of the issuer**.[33] (emphasis added)

36. The purpose of the proviso is clear. If a right has been acquired with a control purpose or effect, the holder must be deemed immediately to be the beneficial owner of the underlying shares so that the disclosures required by Section 13(d) are made because such a

---

[31] See, e.g., Filing And Disclosure Requirements Relating To Beneficial Ownership, Release No. 34-14692 (Apr. 21, 1978), 43 Fed. Reg 18484, 18490 (Apr. 28, 1978), 1978 WL 170898 at *15, "shall be deemed the beneficial owner of the underlying securities."

[32] Modernization of Beneficial Ownership Reporting, Release No. 34-94211 (Feb. 10, 2022)("SEC 2022 Proposing Release"), 87 Fed. Reg. 13846, 13860 (Mar. 10, 2022). "Similarly, under Rule 13d-3(d)(1), if a right has been acquired for the purpose or with the effect of changing or influencing control of the issuer of securities, that person is treated as a beneficial owner of the underlying class of equity securities regardless of when that right may be exercisable, exchangeable or convertible."

[33] Beneficial Ownership Reporting Requirements and Security-Based Swaps, Release No. 34-64628 (Jun. 8, 2011), 76 Fed. Reg. 34579, 34585 (Jun. 14, 2011).

holder necessarily has the "potential to influence or change control of the issuer." Treating the underlying shares as beneficially owned when there is a control purpose or effect "is necessary to achieve the purpose of Section 13 so that Sections 13(d) and 13(g) continue to require the filing of beneficial ownership reports that produce disclosure by persons who have the ability or potential to change or influence control of the issuer."[34] Thus, under Rule 13d-3(d)(1)(i), if a right has been acquired for the purpose or with the effect of changing or influencing control of the issuer of securities, "that person is treated as a beneficial owner of the underlying class of equity securities **regardless of when that right may be exercisable, exchangeable or convertible** … because [the SEC] recognized that such a right, when acquired for the purpose or with the effect of changing or influencing control, can be used to influence the control of the issuer **even before the right is exercisable**." (emphasis added).[35]

## THE BLOCKER PROVISIONS IN THE WARRANTS HAVE NO EFFECT ON THE BENEFICIAL OWNERSHIP DETERMINATION UNDER RULE 13d-3(d)(1)(i)

37. The Warrants in the Equity Transactions, described in more detail in paragraphs 56 to 73, each included "blockers" that prevented the Anson Funds from exercising the Warrants to the extent that their beneficial ownership of Common Stock after exercise would be greater than 4.99% or 9.99% of the Company's outstanding shares of Common Stock.

38. Relevant provisions in the blockers were as follows[36]:

---

[34] *Id.* at 34,586. As explained by the SEC in the SEC 2022 Proposing Release, "Congress enacted Section 13(d) as a means of requiring timely disclosures needed for informed investment decisions that ultimately could contribute to the accurate valuation of securities." SEC 2022 Proposing Release, 87 Fed. Reg. at 13852.

[35] SEC 2022 Proposing Release at 87 Fed. Reg. at 13860 and 13862.

[36] These provisions appeared in the pre-funded warrants and common warrants in Transactions 1, 2 and 3 (see *infra* ¶¶ 56, 59, and 62), the September 2025 Inducement Warrants (see *infra* ¶ 65 ),

> <u>**Holder's Exercise Limitations**</u>. The Company shall not effect any exercise of this Warrant, and a Holder **shall not have the right to exercise** any portion of this Warrant, pursuant to Section 2 or otherwise, **to the extent that after giving effect to such issuance after exercise** as set forth on the applicable Notice of Exercise, **the Holder** (together with the Holder's Affiliates, and any other Persons acting as a group together with the Holder or any of the Holder's Affiliates (such Persons, "<u>Attribution Parties</u>")), **would beneficially own in excess of the Beneficial Ownership Limitation** (as defined below). **For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder** and its Affiliates and Attribution Parties shall include the number of shares of Common Stock issuable upon exercise of this Warrant with respect to which such determination is being made, but **shall exclude the number of shares of Common Stock which would be issuable upon (i) exercise of the remaining, nonexercised portion of this Warrant beneficially owned by the Holder** or any of its Affiliates or Attribution Parties …. **Except as set forth in the preceding sentence, for purposes of this Section 2(e), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, it being acknowledged by the Holder that the Company is not representing to the Holder that such calculation is in compliance with Section 13(d) of the Exchange Act** and the Holder is solely responsible for any schedules required to be filed in accordance therewith. …The "Beneficial Ownership Limitation" shall be [4.99%/9.99%] of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon exercise of this Warrant. (emphasis added)

39. The clear wording of the blocker provision states that (i) the blocker is only a limitation on the ability of the holder to exercise the Warrant (the section heading is "Holder's Exercise Limitations"), (ii) beneficial ownership of shares issuable upon the exercise of the Warrant that would exceed the Beneficial Ownership Limitation (i.e., the 4.99% or 9.99% cap) are only excluded in determining the number of shares as to which the Warrant may be exercised, and (iii) other than with respect to the limitation on exercise of the Warrant, "beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act

---

and the October 2025 Inducement Warrants (see *infra* ¶ 68). In addition, upon the exercise of Warrants in the September and October 2025 Warrant Inducement Transactions *(*see *infra* ¶ 71), the exercised Warrants were deemed to be converted into prepaid Warrants subject to the same blocker provisions as set forth in the exercised Warrants.

and the rules and regulations promulgated thereunder." Further, the holder of the Warrant (the Anson Funds) acknowledges that the Company is not representing that the calculation which excludes the unexercised portion of the Warrant complies with Section 13(d).

40. Under Rule 13d-3(d)(1)(i) the Anson Funds were deemed to be the beneficial owners of all shares underlying the Warrants, and the blocker provisions have no effect on such beneficial ownership determination. The blocker provisions only limited the exercise of the Warrants at any given time but did not, and could not, affect the number of shares that the Anson Funds were deemed to own under Rule 13d-3(d)(1)(i) if the Anson Funds and other Anson Defendants had a control purpose or effect.[37]

41. In the absence of a control purpose or effect, the blocker's limitation on the exercise of the warrant works to limit the holder's "right to acquire beneficial ownership" within the meaning of the lead-in clause of Rule 13d-3(d)(1)(i). Because the "right to acquire beneficial ownership" in the lead-in clause is measured **at any given time**, the blocker's limitation on the exercise of the warrant limits beneficial ownership to the beneficial ownership limitation, or cap, prescribed by the blocker. *See*, *Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10, 16 (2d Cir. 2001), *20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*, 180 F.4th 490, 495-496 (2d Cir. 2026).

42. Where there is a control purpose or effect, however, the proviso kicks in and mandates that the holder of the warrant is deemed to be the beneficial owner of all underlying shares ("the securities **which may be acquired** through the exercise [of the warrant]"). Each of

---

[37] The Second Circuit recently stated that contracts should be interpreted based on the clear text of the contract: "Not surprisingly, we have interpreted and assessed contracts by looking to their text." *20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*, 180 F.4th 490, 498 (2d Cir. 2026).

the Warrants expressly stated that the holder was entitled to purchase up to the full number of shares referenced in the respective Warrant.[38] The blocker's limitation on exercise, as a contractual matter, continues to limit the holder's ability to exercise the warrant at any given time, but simply has no effect on the proviso deeming the holder to be the beneficial owner of all underlying shares for purposes of Section 13(d) and under SEC Rule 16a-1(a)(1).

**THE ANSON FUNDS ARE A SECTION 16(b) GROUP**

43. Under SEC Rule 16a-1(a)(1), 17 CFR §240.16a-1(a)(1) ("Rule 16a-1(a)(1)"), where two or more persons "act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding or disposing of securities of an issuer" as set forth in Section 13(d)(3) of the Exchange Act, such persons are deemed to be a "group" for purposes of determining §16(b) liability. Under Rule 16a-1(a)(1), the shares held by persons in such a group are aggregated to determine whether the group has a greater than 10% beneficial ownership in the issuing corporation. If the aggregate number of shares beneficially owned by the group exceeds 10%, each member of the group is deemed to be a greater than 10% beneficial owner and is liable to disgorge profits arising from transactions by such group member affected within a six-month period. See, *Rubenstein v. International Value Advisers, LLC*, 959 F.3d 541, 546 (2d Circuit 2020); *Roth v. Jennings*, 489 F.3d 499, 513-514 (2d Cir. 2007).

44. The Anson Funds constitute a group for purposes of determining beneficial ownership under Section 13(d)(3) and Section 16 of the Exchange Act and the rules promulgated thereunder. At all relevant times, the Anson Funds, as a group, were a greater than 10% beneficial owner of the Company's Common Stock and each of AIMF and AEMF therefore was

---

[38] See, e.g., the Company's Form 8-K filed Jan. 29, 2025 disclosing Transaction 3 (*infra* ¶¶ 62-64) referring to "common warrants ('Common Warrants') to purchase up to 19,685,040 shares of Common Stock."

a statutory insider for purposes of §§16(a) and (b) of the Exchange Act. Independent of the Anson Funds, as a group, each of AIMF and AEMF was a greater than 10% beneficial owner of the Company's Common Stock and a statutory insider for relevant times when short-swing profits were realized. Each of the other Anson Defendants was a greater than 10% beneficial owner by having shared voting and investment power over the Company securities held by the Anson Funds.

45. As all purchases and sales of Common Stock and all purchases and exercises of Warrants for each of the Anson Funds were directed by Anson Management and Anson Advisors, at all relevant times a group was formed and operative within the meaning of Section 13(d)(3) and Section 16 of the Exchange Act, for the purpose of acquiring, holding and disposing of shares of Common Stock. Other indicia of group activity include that AIMF and AEMF participated in the five Equity Transactions with the same allocations for each Equity Transaction and exercised their Warrants and sold their shares of Common Stock in lockstep.[39]

**<u>THE ANSON DEFENDANTS' CONTROL PURPOSE OR EFFECT</u>**

46. The Anson Funds were the beneficial owners of all shares underlying the Warrants because the Anson Funds and the other Anson Defendants had a control purpose or

---

[39] This is evidenced by the selling stockholders table in the Company's registration statement on Form S-3 filed on October 10, 2025 at p. 8. The table shows that AIMF had an allocation of 15,354,331 September 2025 Inducement Warrants (see *infra* ¶¶ 65-67) and AEMF had an allocation of 4,330,709 September 2025 Inducement Warrants, showing an allocation of 78% for AIMF and 22% for AEMF. The table further shows that AIMF owned 4,680,000 shares from prior Equity Transactions and AEMF owned 1,320,000 shares from prior Equity Transactions, again showing the same 78% and 22% allocations and also showing that AIMF and AEMF sold their shares in the same 78% and 22% proportion. Finally, the table shows AIMF beneficially owned an additional 17,443,696 shares issuable upon exercise of Warrants (excluding the September 2025 Inducement Warrants) and AEMF beneficially owned an additional 4,920,018 shares issuable upon exercise of Warrants (excluding the September 2025 Inducement Warrants), again showing the same 78% and 22% allocations.

effect. As a result, the Anson Funds, as a group, and each of AIMF and AEMF individually, were greater than 10% owners of the Common Stock and are liable for short-swing profits derived from purchases and sales of SELLAS securities within a period of less than six months; the other Anson Defendants are liable to the extent of their respective pecuniary interests.

47. The determination of whether there is a control purpose or effect is necessarily based on the relevant facts and circumstances. As the SEC stated: "Whether investors are engaged in activity with the purpose or effect of changing or influencing control of an issuer, and thus holding beneficial ownership with a disqualifying purpose or effect, ordinarily is a determination that would be based upon the specific facts and circumstances. For that reason, the Commission has not provided extensive guidance on this issue."[40]

48. More recently, the Division of Corporation Finance Staff of the SEC has stated that "[t]he determination of whether a shareholder acquired or is holding the subject securities with a purpose or effect of 'changing or influencing' control of the issuer is based on all the relevant facts and circumstances and will be informed by the meaning of 'control' as defined in Exchange Act Rule 12b-2."[41]

49. SEC Rule 12b-2, 17 CFR § 240.12b-2, defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

---

[40] SEC 2022 Proposing Release, 87 Fed. Reg, 13854, n.47 and Modernization of Beneficial Ownership Reporting, Release No. 34-98704 (Oct. 10, 2023), 88 Fed. Reg. 76896 at 76900, n. 29 (Nov. 7, 2023)("Adopting Release").

[41] SEC Div. Corp. Fin., Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting, Q. 103.12 (Last Updated Sept. 2, 2026).

50. The combination of (a) the Anson Funds acting as the sole source (Transactions 2 through 5) or 50% source (Transaction 1) of the Company's equity financing across all five Equity Transactions, (b) the Company's dependence on equity financing to continue as a going concern, and (c) the restrictive covenants in each transaction, which together with the warrant overhang the Anson Funds had accumulated, effectively precluded the Company from seeking financing from other investors, gave the Anson Funds a "vice grip" on the Company's ability to obtain financing. This meant that the Anson Funds had power over the most important policy of the Company, i.e., the financing it needed to exist as a company and therefore "the power to direct or cause the direction of the management and policies" of the Company. See *infra* ¶¶ 56-81.

51. Transaction 5 demonstrates the Anson Funds' veto power over the Company's financing and is a contemporaneous, documented instance in which the Anson Funds used their contractual position to control the terms on which the Company could secure the financing that it needed to avert bankruptcy. The September 2025 Warrant Inducement Agreement imposed a restriction period, and one month later, the Company needed additional financing. The Anson Funds waived the restriction they had imposed only weeks earlier as a condition of their own transaction. See *infra* ¶¶ 65-68.

52. The magnitude of the Anson Funds' position (representing beneficial ownership of as high as approximately 49.3% of the outstanding Common Stock after Transaction 3 and ranging from approximately 42.8% of the outstanding Common Stock after Transaction 2 to approximately 31.1% of the outstanding Common Stock after Transaction 5) gave the Anson Funds enormous leverage over the Company. The Anson Funds' ability to exercise their Warrants (with a warrant overhang that reached as high as 41.2%) effectively guaranteed that no

other investor would purchase new equity from the Company and risk a collapse of the share price due to the Anson Funds exercising their Warrants and selling the shares they received upon exercise of their Warrants. See *infra* ¶¶ 59-81.

53. The SEC has recognized that large positions, even without voting or dispositive power, may exert a control purpose or effect:

> … such holders may possess economic power that can be used to produce desired outcomes through engagement with a counterparty or the issuer of the reference security and potentially could impact the stock price. An unwinding of agreements governing cash-settled derivatives also could adversely impact the stock price of an issuer, just as if the holder of the cash-settled derivative held the stock directly, instead of the counterparty, and sold sizable blocks of such shares. Consequently, counterparty dispositions of reference securities at the conclusion of a cash-settled derivative agreement, should they occur all together or involve high concentrations of beneficial ownership, may impair the orderly operation and efficiency of our capital markets. In the event of a default, these derivative positions could not only adversely impact counterparties, but also issuers of reference securities, the markets and other market participants.[42]

While the SEC made this statement in the context of proposed rulemaking relating to cash-settled derivatives, the same reasoning applies to warrants subject to blocker provisions. Where the underlying number of warrant shares is great, the holder "may possess economic power that can be used to produce desired outcomes." Further, the Anson Funds had the power to dispose of the full number of underlying shares, a factor not present in cash-settled derivatives.

54. As noted above, the Company's financial distress is a relevant fact and circumstance in assessing whether the Anson Defendants had power to direct or cause the direction of the management and policies of the Company. In its 1998 release amending its rules under Section 13(d) to permit passive investors to file on the short-form Schedule 13G, the SEC identified as an important factor in assessing the facts and circumstances: "[d]oes the filing

---

[42] SEC 2022 Proposing Release, 87 Fed. Reg. at 13861.

person purchase securities in the ordinary course of business and by its nature does not seek to acquire control of companies?"[43] This factor is significant because it establishes that an investor's conduct toward other companies—and its institutional self-description—is relevant to the facts and circumstances analysis for any specific investment. The Anson Funds' public materials describe "Activism" as a defined component of its investment strategy: "[f]ormal engagement advocating for enhanced governance, operational and strategic changes to unlock value."[44] The firm identifies portfolio manager Sagar Gupta, who leads the activism strategy at Anson Funds. Within the past two years, the Anson Defendants have conducted a proxy fight against Match Group Inc., entered cooperation agreements with Five9 Inc. and SPS Commerce Inc. involving governance changes, and publicly pushed for leadership or ownership changes at SPS Commerce.[45] These are important facts and circumstances in determining whether the Anson Defendants had a control purpose or effect.

55. The Anson Funds' power over the management and policies of the Company is further evidenced by a key provision in the Warrants. In the event of any change of control transaction, such as a sale of all or substantially all of the Company's assets or a merger by the Company, the Anson Funds had an option to be paid the Black-Scholes value of the unexercised

---

[43] Amendments to Beneficial Ownership Reporting Requirements, Release No. 34-39538 (Jan. 12, 1998), 63 Fed. Reg. 2854, 2859 (Jan. 16, 1998).

[44] Anson Funds website, "Strategies" webpage, *https://ansonfunds.com/#strategiesSection* (Last visited Nov. 4, 2026).

[45] See, Match Group Scrambles to Appease Shareholders After Anson Push, Boardroom Alpha (April 8, 2025), available at *https://www.boardroomalpha.com/research/match-group-scrambles-to-appease-shareholders-after-anson-push*; Five9, Inc. Form 8-K (filed Feb. 20, 2026); and Activist Fund with $2.3B in Assets Pushes for SPS Commerce Sale or Leadership Change, dealroom.com (December 2025), available at *https://app.dealroom.co/news/feed/activist-fund-with-2-3b-in-assets-pushes-for-sps-commerce-sale-or-leadership-change.*

portion of the Warrants. The Black-Scholes value likely would have represented a significant premium over the implicit value of the Warrants (i.e., the spread between the exercise price and the trading price), thereby requiring the Company or its merger partner to negotiate with the Anson Funds with respect to the consideration that the Anson Funds would receive in a change of control transaction, or otherwise forego the transaction because the premium could have made the deal uneconomic. Moreover, the provision in the Warrant provided that the Anson Funds would receive the consideration for all underlying Warrant shares "without regard to" the blocker provision. Given the magnitude of the Anson Funds' position, the effect of this provision in the Warrants effectively gave the Anson Funds with veto power over a change of control transaction, further evidencing their power over the management and policies of SELLAS.

## THE EQUITY TRANSACTIONS AND SELLAS' FINANCIAL DISTRESS

### A. The Anson Funds' Equity Transactions, Sales of Common Stock, and Beneficial Ownership

56. Transaction 1: *March 2024 Registered Direct Offering and Concurrent Private Placement*.[46] The Anson Defendants violated Section 16(a) and did not file beneficial ownership reports on Form 4.[47] On or about March 15, 2024, SELLAS closed a registered direct offering and concurrent private placement of 11,000,000 shares of Common Stock, 2,029,316 pre-funded

---

[46] Unless otherwise noted, all factual statements regarding the March 2024 financing are drawn from the Company's Form 8-K filed Mar. 15, 2024 and Ex. 10.1 thereto ("Securities Purchase Agreement dated March 15, 2024"), and the Company's registration statements on Form S-3 (filed Mar. 28, 2024 and Oct. 10, 2025).

[47] See ¶¶ 83-88, *infra*. In the absence of Form 4s, the only way to estimate when the Anson Funds sold shares of Common Stock is to: (i) review Anson Management's Forms 13F to determine when shares of Common Stock purchased in Transactions 1 through 3 were sold; (ii) review the Company's Forms 10-K and 10-Q to determine when the Anson Funds exercised their Warrants; and (iii) based on (ii), review Anson Management's Forms 13F to determine when shares of Common Stock acquired upon exercise of Warrants were sold.

warrants, and common warrants exercisable into 13,029,316 shares of Common Stock (referred to herein as "Transaction 1"). The Anson Funds were a 50% co-investor with two funds managed by Highbridge Capital Management. The Anson Funds' 50% allocation was 5,500,000 shares of Common Stock, 1,014,658 pre-funded warrants, exercisable at $0.0001 per share, and 6,514,658 common warrants, exercisable at $1.41 per share. AIMF had a 78% allocation of these shares and Warrants, and AEMF had a 22% allocation. The Securities Purchase Agreement dated March 15, 2024, Section 4.10(a), imposed a restriction on the Company's ability to execute equity financings for a period of 60 days, and Section 4.10(b) imposed a restriction on the Company's ability to execute variable rate transactions for a period of 24 months from closing.

57. Beneficial Ownership After Transaction 1: Based on the Company's disclosure that 32,132,890 shares were outstanding as of December 31, 2023[48] and giving effect to the issuance of 10,130,000 shares in a registered direct offering in January 2024[49], the Anson Funds' beneficial ownership after Transaction 1 was approximately 23.6% of the Company's outstanding shares; AIMF's beneficial ownership was approximately 18.9%. The Anson Funds' Warrants from Transaction 1 represented an immediate warrant overhang of approximately 13.6% of the Company's outstanding shares.

58. Beneficial Ownership As of 6/30/2024: Based on disclosures in the Company's Form 10-Q for the quarter ended June 30, 2024 and Anson Management's Form 13F filed for the period ended June 30, 2024, the Anson Funds had exercised their 1,014,658 pre-funded Warrants

---

[48] SELLAS Form 10-K for the year ended Dec. 31, 2023 (filed Mar. 28, 2024) ("SELLAS Form 10-K (2023)") at p. 134.

[49] SELLAS Form 8-K filed Jan. 8, 2024.

by June 30, 2024[50] and had sold the 1,014,658 shares received upon exercise as well the 5,500,000 shares purchased in Transaction 1.[51] Based on the Company's disclosure that 57,754,928 shares were outstanding as of June 30, 2024[52], the Anson Funds maintained a beneficial ownership of approximately 10.1% of the outstanding Common Stock until Transaction 2.

59. Transaction 2: *August 2024 Registered Direct Offering*.[53] On July 30, 2024, four and one-half months after Transaction 1, SELLAS entered into a Securities Purchase Agreement for, and on or about August 1, 2024 closed, a registered direct offering of 6,370,070 shares of Common Stock, 9,478,986 pre-funded warrants, exercisable at $0.0001 per share, and 15,849,056 common warrants, exercisable at $1.20 per share (referred to herein as "Transaction 2"). The Anson Funds were the sole investor (confirmed because the October 2025 Warrant Inducement Agreement, *infra* ¶68, covers this exact 15,849,056 warrant count). AIMF had a 78% allocation of these shares and Warrants, and AEMF had a 22% allocation. The Securities Purchase Agreement dated July 30, 2024, Section 4.9(a), imposed a restriction on the Company's ability to execute equity financings for a period of 90 days, and Section 4.9(b) imposed a restriction on the Company's ability to execute variable rate transactions for a period of 24 months.

---

[50] SELLAS Form 10-Q for the quarter ended June 30, 2024 (filed Aug. 13, 2024) ("Sellas Form 10-Q (2Q 2024) at p. 14.

[51] Anson Management Form 13F for the quarter ended June 30, 2024 (filed Aug. 13, 2024) ("Anson Management Form 13F (2Q 2024)").

[52] Sellas Form 10-Q (2Q 2024) at p. 4.

[53] Unless otherwise noted, all factual statements regarding the August 2024 financing are drawn from the Company's Form 8-K filed Aug. 1, 2024 and Ex. 10.1 thereto ("Securities Purchase Agreement dated July 30, 2024"), and the Company's registration statement on Form S-3 filed Oct. 10, 2025.

60. Beneficial Ownership After Transaction 2: Based on the Company's disclosure that 57,754,928 shares were outstanding as of June 30, 2024[54], the Anson Funds' beneficial ownership after Transaction 2 (after taking into account that the Anson Funds had sold the 5,500,000 shares purchased in Transaction 1 and the 1,014,658 shares issued upon exercise of the Transaction 1 pre-funded warrants) was approximately 42.8% of the Company's outstanding shares; AIMF's beneficial ownership was approximately 31.9% and AEMF's beneficial ownership was approximately 13.0%. The Anson Funds' Warrants from Transaction 2, together with the 6,514,658 common warrants from Transaction 1, represented an immediate warrant overhang of approximately 39.8% of the Company's outstanding shares.

61. Beneficial Ownership As of 12/31/2024: Based on disclosures in the Company's Form 10-K for the year ended December 31, 2024 and Anson Management's Form 13F filed for the period ended December 31, 2024, the Anson Funds had exercised their 9,478,986 pre-funded Warrants by December 31, 2024[55] and had sold the 9,478,986 shares received upon exercise as well the 6,370,000 shares purchased in Transaction 2 (other than 1,192,266 shares that the Anson Funds had not yet sold)[56]. Based on the Company's disclosure that 73,977,459 shares were outstanding as of December 31, 2024[57], the Anson Funds maintained a beneficial ownership of approximately 23.2% of the outstanding Common Stock until Transaction 3; AIMF maintained a beneficial ownership of approximately 19.1%.

---

[54] SELLAS Form 10-Q (2Q 2024) at p. 4.

[55] SELLAS Form 10-K for the year ended December 31, 2024 (filed Mar. 20, 2024) ("SELLAS Form 10-K (2024)") at p. 149.

[56] Anson Management Form 13F for quarter ended December 31, 2024 (filed February 14, 2025))("Anson Management Form 13F (2024)").

[57] SELLAS Form 10-K (2024) at p. 134.

62. Transaction 3: *January 2025 Registered Direct Offering.*[58] On or about January 28, 2025, approximately six months after Transaction 2, SELLAS closed a registered direct offering of 8,200,000 shares of Common Stock, 11,485,040 pre-funded warrants, exercisable at $0.0001 per share, and 19,685,040 common warrants, exercisable at $1.20 per share (referred to herein as "Transaction 3"). The Anson Funds were the sole investor (confirmed because the September 2025 Warrant Inducement Agreement, *infra* ¶65 covers this exact 19,685,040 warrant count), described in the Company's Form 8-K as a "single healthcare-focused institutional investor."[59] AIMF had a 78% allocation of these shares and Warrants, and AEMF had a 22% allocation. The Securities Purchase Agreement dated January 28, 2025, Section 4.9, imposed a restriction on the Company's ability to execute equity financings for a period of 105 days — the longest equity restriction in this series; this agreement did not include a separate variable-rate-transaction restriction.

63. Beneficial Ownership After Transaction 3: Based on the Company's disclosure that 73,977,459 shares were outstanding as of December 31, 2024[60], the Anson Funds' beneficial ownership after Transaction 3 (after taking into account that the Anson Funds had sold the 6,370,070 shares purchased in Transaction 2 and the 9,478,986 shares issued upon exercise of the Transaction 2 pre-funded warrants, other than 1,192,266 shares that the Anson Funds had not

---

[58] Unless otherwise noted, all factual statements regarding the January 2025 financing are drawn from the Company's Form 8-K (filed Jan. 29, 2025) and Ex. 10.1 thereto ("Securities Purchase Agreement dated January 28, 2025"), and the Company's registration statement on Form S-3 (filed Oct. 10, 2025).

[59] SELLAS Form 8-K filed Jan. 29, 2025 at Item 1.01. The reference to the Anson Funds as a "single healthcare-focused institutional investor" was a misleading description of the Anson Funds which served to obscure the identity of the Anson Funds as the investor. *See infra* ¶¶ 82-88.

[60] SELLAS Form 10-K (2024) at p. 134.

yet sold) was approximately 49.3% of the Company's outstanding shares; AIMF's beneficial ownership was approximately 42.4% and AEMF's beneficial ownership was approximately 16.1%. The Anson Funds' Warrants from Transaction 3, together with the 6,514,658 common warrants from Transaction 1 and 15,849,056 common warrants from Transaction 2, represented an immediate warrant overhang of approximately 41.2% of the Company's outstanding shares.

64. Beneficial Ownership As of 8/11/2025: Based on disclosures in the Company's Form 10-Q for the quarter ended June 30, 2025 and Anson Management's Form 13F filed for the period ended June 30, 2025, the Anson Funds had exercised their 11,485,040 pre-funded Warrants by June 30, 2025[61] and had sold the 11,485,040 shares received upon exercise as well the 8,200,000 shares purchased in Transaction 3 (other than 275,000 shares that the Anson Funds had not yet sold).[62] Based on the Company's disclosure that 105,297,469 shares were outstanding as of August 11, 2025[63], the Anson Funds maintained a beneficial ownership of approximately 28.7% of the outstanding Common Stock until Transaction 4; AIMF maintained a beneficial ownership of approximately 23.9%.

65. Transaction 4: *September 2025 Warrant Inducement*.[64] On or about September 10, 2025, approximately seven months after Transaction 3, SELLAS entered into a warrant inducement transaction with the Anson Group as the sole participant ("September 2025 Warrant

---

[61] SELLAS Form 10-Q for the quarter ended June 30, 2025 (filed Aug. 12, 2025)("SELLAS Form 10-Q (2Q 2025)") at p. 15.

[62] Anson Management Form 13F for the period ended June 30, 2025 (filed Aug. 14, 2025) ("Anson Management Form 13F (2Q 2025)").

[63] SELLAS Form 10-Q (2Q 2025) at cover page.

[64] Unless otherwise noted, all factual statements regarding the September 2025 warrant inducement are drawn from the Company's Form 8-K filed Sept. 11, 2025 and Ex. 10.1 thereto ("Warrant Inducement Agreement dated September 10, 2025").

Inducement Agreement”). Pursuant to the September 2025 Warrant Inducement Agreement, the Anson Funds exercised their January 2025 common warrants from Transaction 3 (19,685,040 shares), and received new inducement warrants exercisable into 19,685,040 shares (“September 2025 Inducement Warrants”)(referred to herein as “Transaction 4”). AIMF had a 78% allocation of the September 2025 Inducement Warrants, and AEMF had a 22% allocation. The September 2025 Warrant Inducement Agreement, Annex A, Section (h), imposed a restriction on the Company’s ability to execute equity financings for a period of 90 days and a restriction on the Company’s ability to execute variable rate transactions for a period of 12 months.

66. Beneficial Ownership After Transaction 4: Based on the Company’s disclosure that 105,297,469 shares were outstanding as of August 11, 2025[65], the Anson Funds’ beneficial ownership after Transaction 4 (after taking into account that the Anson Funds had sold the 8,200,000 shares purchased in Transaction 3 and the 11,485,040 shares issued upon exercise of the Transaction 3 pre-funded warrants) was approximately 37.0% of the Company’s outstanding shares; AIMF’s beneficial ownership was approximately 31.4% and AEMF’s beneficial ownership was approximately 11.4%. The Anson Funds’ September 2025 Inducement Warrants, together with the 6,514,658 common warrants from Transaction 1, 15,849,056 common warrants from Transaction 2 and the exercised 19,685,040 common warrants from Transaction 3 (which became prepaid warrants under the September 2025 Warrant Inducement Agreement)[66], represented an immediate warrant overhang of approximately 37.0% of the Company’s outstanding shares.

[65] SELLAS Form 10-Q (2Q 2025) at cover page.

[66] SELLAS Form 8-K filed Sept. 11, 2025, Ex. 10.1 (Warrant Inducement Agreement) at par. 3.

67. Beneficial Ownership As of 9/30/2025: Based on disclosures in the Company's Form 10-Q for the quarter ended September 30, 2025 and Anson Management's Form 13F filed for the period ended September 30, 2025, the Anson Funds had exercised their 19,685,040 common warrants from Transaction 3 by September 30, 2025[67] and had sold the 19,685,040 shares received upon exercise (other than 6,032,938 shares that the Anson Funds had not yet sold).[68] Based on the Company's disclosure that 125,078,525 shares were outstanding as of September 30, 2025[69], the Anson Funds maintained a beneficial ownership of approximately 28.8% of the outstanding Common Stock until Transaction 5; AIMF maintained a beneficial ownership of approximately 23.8%.

68. Transaction 5: *October 2025 Warrant Inducement*.[70] On or about October 24, 2025, six weeks after Transaction 4, SELLAS entered into a second warrant inducement transaction with the Anson Funds as the sole participant ("October 2025 Warrant Inducement Agreement"). This transaction required, as a condition to the Anson Group's participation, the waiver of the financing restriction imposed by the September 2025 Warrant Inducement Agreement only one month earlier — the October 2025 Warrant Inducement Agreement recites that "the Holder hereby waives its rights with respect to the prohibition on the issuance of securities pursuant to Section (h) of Annex A to that certain Warrant Inducement Agreement

---

[67] SELLLAS Form 10-Q for the period ended September 30, 2025 (filed Nov. 12, 2025)("SELLAS Form 10-Q (3Q 2025)") at p. 15.

[68] Anson Management Form 13F for the period ended September 30, 2025 (filed Nov. 14, 2024) ("Anson Management Form 13F (3Q 2025)").

[69] SELLAS Form 10-Q (3Q 2025) at p.4.

[70] Unless otherwise noted, all factual statements regarding the October 2025 warrant inducement are drawn from the Company's Form 8-K filed Oct. 27, 2025 and Ex. 10.1 thereto (Warrant Inducement Agreement dated October 24, 2025).

dated as of September 10, 2025." Pursuant to the October 2025 Warrant Inducement Agreement, the Anson Funds exercised their March 2024 and July 2024 common warrants from Transactions 1 and 2 (6,514,658 + 15,849,056 = 22,363,714 shares) and received new inducement warrants exercisable into 22,363,714 shares ("October 2025 Inducement Warrants")(referred to herein as "Transaction 5"). AIMF had a 78% allocation of the October 2025 Inducement Warrants, and AEMF had a 22% allocation. The October 2025 Warrant Inducement Agreement, Annex A, Section (i), imposed a restriction on the Company's ability to execute equity financings for a period of 75 days and a restriction on the Company's ability to execute variable rate transactions for a period of 12 months.

69. Beneficial Ownership After Transaction 5: Based on the Company's disclosure that 125,078,525 shares were outstanding as of September 30, 2025[71], the Anson Funds' beneficial ownership after Transaction 5 (after taking into account that the Anson Funds had sold approximately 13,685,040 shares of the 19,685,040 shares issued upon exercise of the January 2025 common warrants) was approximately 37.2% of the Company's outstanding shares; AIMF's beneficial ownership was approximately 31.1% and AEMF's beneficial ownership was approximately 11.1%. The Anson Funds' October 2025 Inducement Warrants, together with the September 2025 Inducement Warrants and the exercised March 2024 and July 2024 common warrants (6,514,658 + 15,849,056 = 22,363,714 shares) (which became prepaid warrants under the October 2025 Warrant Inducement Agreement)[72], represented an immediate warrant overhang of approximately 34.0% of the Company's outstanding shares.

[71] SELLAS Form 10-Q (3Q 2025) at p. 4.

[72] SELLAS Form 8-K filed Oct. 27, 2025, Ex. 10.1 (Warrant Inducement Agreement dated October 24, 2025) at par. 3.

70. Beneficial Ownership as of 12/31/2025: Based on disclosures in the Company's Form 10-K for the year ended December 31, 2025, by December 31, 2025, the Anson Funds had exercised their entire 19,685,040 common warrants from Transaction 3 and their 22,363,714 common warrants from Transactions 1 and 2, but had not exercised the September 2025 Inducement Warrants or the October 2025 Inducement Warrants.[73] Based on the Company's disclosure that 153,103,459 shares were outstanding as of December 31, 2025[74], the Anson Funds' beneficial ownership as of December 31, 2025 was approximately 21.5% of the outstanding Common Stock; AIMF's beneficial ownership was approximately 17.6%.

71. Beneficial Ownership as of 3/31/2026: Based on disclosures in the Company's Form 10-Q for the quarter ended March 31, 2026, the Anson Funds had exercised their September 2025 Inducement Warrants (19,685,040 warrant shares) from Transaction 4 by March 31, 2026.[75] Based on disclosures in the Company's Form 10-Q for the quarter ended June 30, 2026, the Anson Funds had exercised their October 2025 Inducement Warrants (22,363,714 warrant shares) from Transaction 5 (other than approximately 4,064,000 warrant shares) by June 30, 2026.[76] Based on Anson Management's Form 13F for the period ended March 31, 2026, the Anson Funds had sold the 19,685,040 shares received upon exercise of the September 2025 Inducement Warrants between January 1, 2026 and March 31, 2026.[77] Accordingly, as of March

---

[73] SELLAS Form 10-K for the period ended December 31, 2025 (filed Mar. 19, 2026) ("SELLAS Form 10-K (2025)") at p. 147.

[74] SELLAS Form 10-K (2025) at p. 132.

[75] SELLAS Form 10-Q for the quarter ended March 31, 2026 (filed May 12, 2026)("SELLAS Form 10-Q (1Q 2026) at p. 13.

[76] SELLAS Form 10-Q (2Q 2026) at p. 13.

[77] Anson Management Form 13F for the period ended March 31, 2026 (filed May 14, 2026)("Anson Management Form 13F (1Q 2026)").

31, 2026, the Anson Funds only retained beneficial ownership of 22,363,714 warrant shares under the October 2025 Inducement Warrants, representing beneficial ownership of approximately 11.0% of the outstanding Common Stock based on the Company's disclosure that there were 181,332,574 shares outstanding as of March 31, 2026.[78]

72. Greater Than 10% Beneficial Ownership From 3/15/2024 to 3/31/2026: The Anson Funds maintained a greater than 10% beneficial ownership of the outstanding Common Stock until they exercised and sold approximately 2 million warrant shares under the October 2025 Inducement Warrants after March 31, 2026. From the time of Transaction 1 on March 15, 2024 until sometime after March 31, 2026, the Anson Funds maintained a greater than 10% beneficial ownership of the outstanding Common Stock, reaching a beneficial ownership of as high as approximately 49.3% of the outstanding Common Stock. AIMF separately maintained a greater than 10% beneficial ownership from August 1, 2024 until sometime between January 1, 2026 and March 31, 2026. AEMF separately maintained a greater than 10% beneficial ownership from August 1, 2024 through at least September 30, 2024 and January 28, 2025 until sometime between October 1, 2025 and December 31, 2025.

73. The cumulative effect of the five Equity Transactions, the sale of the shares purchased in Transactions 1 through 3, the exercise of the pre-funded and common warrants purchased in Transactions 1 through 3 (and sale of the shares acquired upon exercise), and the exercise of the September 2025 and October 2025 Inducement Warrants (and sale of the shares acquired upon exercise)[79], was that the Anson Funds acquired shares and exercised Warrants for

---

[78] SELLAS Form 10-Q (1Q 2026) at p. 4.

[79] Based on the Company's Form 10-Q for the quarter ended June 30, 2026 (at p. 13), the Anson Funds had exercised in full all Warrants other than approximately 4,064,000 shares subject to the October 2025 Inducement Warrant. Based on Anson Management's Form 13F for the quarter

an aggregate of approximately 122.1 million shares and sold approximately 117.6 million shares into the public market (as of June 30, 2026) — with the 122.1 million acquired shares representing approximately 60.5% of the Company's outstanding Common Stock as of June 30, 2026 (and the 117.6 million shares sold representing approximately 58.2% of the Company's outstanding Common Stock as of June 30, 2026)[80] — while ensuring that, during each successive restricted period, the Company could not seek alternative financing sources.

**B. <u>SELLAS' Financial Distress</u>**

74. The Anson Funds' vice grip on the Company's ability to obtain financing was exacerbated by the Company's continued dependence on the equity financing of the kind the Anson Funds provided. The Company's own SEC disclosures supply this predicate, disclosing substantial doubt about its ability to continue as a going concern across five consecutive quarterly reporting periods before that doubt was resolved contemporaneously with the October 2025 warrant inducement transaction.

75. The Company's Form 10-Q for the quarter ended June 30, 2024 disclosed cash and cash equivalents of approximately $9.1 million against an accumulated deficit of $234.3 million.[81] The Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section states that the Company's resources "will not be sufficient to fund [SELLAS's] current planned operations for at least the next twelve months," and that

---

ended June 30, 2026, the Anson Funds held 4,500,000 of the shares issued to them upon exercise of the October 2025 Inducement Warrant.

[80] SELLAS Form 10-Q (2Q 2026) at p. 4 reports that as of June 30, 2026, SELLAS had outstanding 201,918,874 shares Common Stock.

[81] SELLAS Form 10-Q (2Q 2024) at p. 26.

"[t]hese conditions give rise to a substantial doubt over [SELLAS's] ability to continue as a going concern."[82]

76. The Company's Form 10-Q for the quarter ended September 30, 2024 disclosed cash and cash equivalents of approximately $21.0 million.[83] The MD&A states that "[t]hese conditions give rise to a substantial doubt over our ability to continue as a going concern."[84]

77. The Company's Form 10-K for the fiscal year ended December 31, 2024 disclosed cash and cash equivalents of approximately $13.9 million against an accumulated deficit of $248.1 million.[85] The Company disclosed that its resources, together with proceeds of the January 2025 registered direct offering, would be insufficient to fund planned operations for at least the next twelve months, and that "[t]hese conditions give rise to a substantial doubt over our ability to continue as a going concern."[86] The independent registered public accounting firm's report included an Emphasis of Matter paragraph regarding going concern.[87]

78. The Company's Form 10-Q for the quarter ended March 31, 2025 disclosed cash and cash equivalents of approximately $28.4 million against an accumulated deficit of $253.9 million.[88] The MD&A again concludes "[t]hese conditions give rise to a substantial doubt over our ability to continue as a going concern."[89]

---

[82] SELLAS Form 10-Q (2Q 2024) at p. 26

[83] SELLAS Form 10-Q for the quarter ended September 30, 2024 (filed Nov. 13, 2024)("SELLAS Form 10-Q (3Q 2024)") at p. 26.

[84] SELLAS Form 10-Q (3Q 2024) at p. 26.

[85] SELLAS Form 10-K (2024) at p. 124.

[86] SELLAS Form 10-K (2024) at p. 125.

[87] SELLAS Form 10-K (2024) at p. 65.

[88] SELLAS Form 10-Q (2Q 2025) at p. 24.

[89] SELLAS Form 10-Q (2Q 2025) at p. 24.

79. The Company's Form 10-Q for the quarter ended June 30, 2025 disclosed cash and cash equivalents of approximately $25.3 million and substantially the same going-concern conclusion.[90]

80. The Company's Form 10-Q for the quarter ended September 30, 2025 disclosed cash and cash equivalents of approximately $44.3 million, together with approximately $29.1 million in net proceeds from the October 2025 warrant inducement. For the first time in this sequence, the Company concluded it expected sufficient resources to fund planned operations for the following twelve months.[91]

81. This pattern — recurring SEC-disclosed substantial doubt about the Company's ability to continue as a going concern, persisting across five consecutive reporting periods before being resolved contemporaneously with a warrant inducement financing — shows that, coupled with the restrictive covenants imposed by the Anson Funds and the warrant overhang from Transactions 1 through 5, the Anson Funds had a financing "vice grip" over the Company's ability to secure equity financing.

## THE ANSON FUNDS OBSCURED THEIR PARTICIPATION IN THE EQUITY TRANSACTIONS

82. None of the Company's Forms 8-K reporting the five Equity Transactions identified the Anson Funds by name.

83. Anson Management, Anson Advisors, Anson GP, Moore, Nathoo and Kassam filed four Schedule 13G statements with respect to the Company, all in reliance on Rules 13d-1(b), 17 CFR § 240.13d-1(b) and 13d-2(b), 17 CFR § 240.13d-2(b): (1) an initial statement with

---

[90] SELLAS Form 10-Q (2Q 2025) at p. 26.

[91] SELLAS Form 10-Q (3Q 2025) at p. 28.

an event date of March 31, 2025, reporting 7,579,095 shares (representing beneficial ownership of 8.3%); (2) an Amendment No. 1 with an event date of June 30, 2025, reporting 5,225,948 shares (representing beneficial ownership of 4.9%); (3) a new initial statement with an event date of September 30, 2025, reporting 6,032,938 shares (representing beneficial ownership of 5.7%); and (4) an Amendment No. 1 to that statement with an event date of December 31, 2025, reporting 7,481,178 shares (representing beneficial ownership of 4.9%).[92]

84. The Anson Defendants were not eligible to file beneficial ownership disclosures pursuant to Rules 13d-1(b) and 13d-2(b). The Anson Funds were greater than 5% beneficial owners and are not among the list of qualified institutional investors listed in Rule 13d-1(b)(1)(ii). The beneficial ownership of the Anson Funds was reported by the Company in the selling stockholders tables in the Company's registration statements on Form S-3 filed with the SEC on March 28, 2024 and October 10, 2025.

85. In the March 28, 2024 selling stockholders table, SELLAS reports AIMF as beneficially owning 10,862,866 shares, representing beneficial ownership of 16.2%, and AEMF as beneficially owning 3,041,450 shares, representing beneficial ownership of 5.1%, or a total beneficial ownership of 19.8%. SELLAS states that its disclosure "is based on information provided by the selling stockholders in connection with the filing of this prospectus." SELLAS reported beneficial ownership information as of March 25, 2024, 10 days after Transaction No. 1

---

[92] Anson Advisors Inc. and Anson Funds Management LP, Schedule 13G (filed May 15, 2025) (initial statement, event date Mar. 31, 2025); Schedule 13G/A (filed Aug. 14, 2025) (Amend. No. 1, event date June 30, 2025); Schedule 13G (filed Nov. 14, 2025) (new initial statement, event date Sept. 30, 2025); Schedule 13G/A (filed Feb. 17, 2026) (Amend. No. 1, event date Dec. 31, 2025).

and states "beneficial ownership [is] determined under Section 13(d) of the Exchange Act and the rules and regulations thereunder."[93]

86. In the October 10, 2025 selling stockholders table, SELLAS reports AIMF as beneficially owning 37,478,027 shares, representing beneficial ownership of 23.1%, and AEMF as beneficially owning 10,570,727 shares, representing beneficial ownership of 7.8%, or a total beneficial ownership of 27.8%. SELLAS states that its disclosure "is based on information furnished to us by the selling stockholders." SELLAS reported beneficial ownership information as of October 1, 2025, 20 days after Transaction No. 4 and states "beneficial ownership [is] determined under Section 13(d) of the Exchange Act and the rules and regulations thereunder."[94]

87. The Company's disclosures in its Form S-3 registration statements, which almost certainly had been approved by the Anson Defendants, establishes that the Anson Funds were beneficial owners of the Common Stock reported in the Schedule 13G filings made by Anson Management, Anson Advisors, Anson GP, Moore, Nathoo and Kassam. Because the Anson Funds were not eligible institutional investors for purposes of Rule 13d-1(b), the Anson Funds would have been required to report their beneficial ownership under Rules 13d-1(c), 17 CFR § 240.13d-1(c) and 13d-2(d), 17 CFR § 240.13d-2(d), which would have required more timely filings, but only if the Anson Funds did not have a control purpose or effect. Because the Anson Funds and other Anson Defendants had a control purpose or effect, the Anson Defendants were required to report their beneficial ownership on Schedule 13D (17 CFR § 240.13d-1), which would have required not only more timely disclosure, but also fulsome disclosures regarding,

---

[93] Form S-3 filed Mar. 28, 2024 at p. 11.

[94] Form S-3 filed Oct. 10, 2025 at pp. 7-8.

among other things, plans or proposals regarding acquisitions or dispositions of Company securities or relating to a merger or other significant change involving the Company.[95]

88. By not properly reporting their beneficial ownership, the Anson Defendants deprived the public markets about information regarding their beneficial ownership of the Common Stock in violation of Section 13(d) and the SEC's rules promulgated thereunder. Information about the Anson Funds beneficial ownership determined in accordance with the proviso in Rule 13d-3(d)(1)(i) (which at times was almost 50%), including the terms of the Warrants, the warrant overhang (or unexercised Warrants), and the Anson Defendants' plans and proposals is exactly the kind of information that Section 13(d) and the SEC's rules promulgated thereunder was designed to elicit to enable public investors to make informed decisions.

## **THE ANSON DEFENDANTS' SHORT-SWING TRANSACTIONS**

89. Because the Anson Defendants did not file beneficial ownership reports on Form 4 under Section 16(a), the only way to estimate when the Anson Funds sold shares of Common Stock is to: (i) review Anson Management's Forms 13F to determine when shares of Common Stock purchased in Transactions 1 through 3 were sold; (ii) review the Company's Forms 10-K and 10-Q to determine when the Anson Funds exercised the Warrants; and (iii) based on (ii), review Anson Management's Forms 13F to determine when shares of Common Stock acquired upon exercise of Warrants were sold. Based on the limited information that is publicly available because the Anson Funds violated Section 16(a) of the Exchange Act (see ¶¶ 82-88, *supra*), the

[95] Under 17 CFR § 240.13d-101, Item 4 of Schedule 13D is titled "Purpose of Transaction." It requires the reporting person to state the purpose or purposes of their acquisition of the issuer's securities, and explicitly describe any plans or proposals that relate to or would result in specific corporate actions.

Anson Funds are liable for at least the following 2 sets of short-swing transactions, including sales based on scenarios that will be revised after discovery of actual sales transactions:

**A. Short-Swing Profit Transactions Set 1**

90. The issuance of the September 2025 Inducement Warrants, *supra,* ¶¶ 65-67, constituted a deemed purchase of the 19,685,040 underlying shares of SELLAS Common Stock under SEC Rule 16b-6(a), 17 C.F.R. § 240.16b-6(a), with profit measured under Rule 16b-6(c)(2), at a deemed purchase price of $1.85 per share (the intraday low share price on September 10, 2025).

91. The issuance of the October 2025 Inducement Warrants, *supra,* ¶¶ 68-70, constituted a deemed purchase of the 22,363,714 underlying shares of SELLAS Common Stock under SEC Rule 16b-6(a), 17 C.F.R. § 240.16b-6(a), with profit measured under Rule 16b-6(c)(2), at a deemed purchase price of $1.89 per share (the intraday low share price on October 24, 2025).

92. Based on the filings cited, and upon information and belief, the Anson Funds sold shares in three sale blocks:

Block A: 4,700,000 shares acquired upon exercise of the October 2025 Inducement Warrants and sold from April 1 through April 23, 2026, within six months of October 24, 2025;

Block B: 19,685,040 shares acquired upon exercise of the September 2025 Inducement Warrants and sold from January 1 through March 9, 2026, within six months of September 10, 2025; and

Block C: 17,663,714 shares sold from December 29 through December 31, 2025, matched against the October 24, 2025 deemed purchase.

The exact dates of these sales are not known because the Anson Funds did not file beneficial ownership reports on Form 4.

93. Attached as **Exhibit 7** is an analysis showing short-swing profits for the Short-Swing Transactions Set 1 in a range of $51,837,237.82 to $138,368,621.00 realized by the Anson Funds by matching the deemed purchases from the September 2025 Inducement Warrants and October 2025 Inducement Warrants (¶¶ 90-91) with open market sales based on publicly available information (¶ 92).

**B. <u>Short-Swing Profit Transactions Set 2</u>**

94. In Transaction 3, the Anson Group purchased 8,200,000 shares of SELLAS Common Stock at a deemed purchase price of $0.64 per share (the $1.27 combined unit price less $0.63 allocated to the accompanying warrant, subject to expert valuation), and the purchase of 11,485,040 pre-funded warrants and 19,685,040 common warrants constituted a deemed purchase of the 31,170,080 underlying shares of Common Stock at a deemed purchase price of $1.06 per share (the low intraday share price on January 28, 2025), totaling 39,370,080 purchased shares.

95. Based on the filings cited, and upon information and belief, the Anson Funds sold shares in six sale blocks, each within six months before or after January 28, 2025, totaling 35,259,056 shares that are matchable against the January 28, 2025 purchases (¶ 94):

<u>Block 1a</u> – 7,304,095 shares sold from April 1 through June 30, 2025;

<u>Block 1b</u> – 3,485,040 shares sold from April 1 through June 30, 2025;

<u>Block 2</u> – 895,905 shares sold from January 1 through March 31, 2025;

<u>Block 3</u> – 8,917,266 shares sold from January 1 through March 31, 2025;

<u>Block 4</u> – 5,576,235 shares sold from August 1 through September 30, 2024; and

Block 5 – 9,080,555 shares sold from October 1 through December 31, 2024.

96. Attached as **Exhibit 8** is an analysis showing the short-swing profits for the Short-Swing Profit Transactions Set 2 in a range of $2,912,694.46 to $27,538,784.23 realized by the Anson Funds by matching the Transaction 3 purchases and deemed purchases (¶ 94) with open market sales (¶ 95) based on publicly available information.

## C. The Anson Funds' Beneficial Ownership in the Transactions Sets

97. At the time of each purchase and at the time of each matched sale in Short-Swing Profit Transactions Set 1 and Short-Swing Profit Transactions Set 2, the Anson Funds, as a group, were greater than 10% beneficial owners of SELLAS Common Stock.

98. Separately, AIMF was a greater than 10% beneficial owner of SELLAS Common Stock during the Short-Swing Profit Transaction Set 2 (¶¶ 94-96 and **Exhibit 8**) and during the Short-Swing Profit Transactions Set 1 (¶¶ 90-93 and **Exhibit 7**) excluding the Block A sales.

99. Separately, AEMF was a greater than 10% beneficial owner of SELLAS Common Stock during the Short-Swing Profit Transactions Set 2 (¶¶ 94-96 and **Exhibit 8**) excluding the Block 5 sales.

## ALLEGATIONS AS TO THE DEMAND

100. On July 20, 2026, Plaintiff made demand on the Board of Directors of the Company to commence this lawsuit based on the facts alleged above. Thereafter, on September 17, 2026, the Company's counsel Douglas P. Baumstein of Mintz advised that the Company's Board of Directors had determined that there was no basis to pursue the claims set forth in the demand letter. The Company has failed and refused to bring suit, and more than sixty days have elapsed since the demand, as required by 15 U.S.C. § 78p(b).

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**AGAINST THE ANSON FUNDS AS A GROUP**

101. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100, *supra*, as if fully set forth herein.

102. At all relevant times, the Anson Funds, as a group, was a greater than 10% beneficial owner of SELLAS Common Stock.

103. As particularized in paragraphs 56-73 and 90-99, *supra*, during the period of August 2024 to April 23, 2026, the Anson Funds engaged in purchase and sale transactions in the Company's Common Stock and related derivative securities resulting in disgorgeable short-swing profits in the amount of between at least $54,749,932.28 and at least $165,907,405.23. See **Exhibits 7** and **8**.

104. The Anson Funds are liable for their short-swing profits to the extent of their pecuniary interest in the short-swing transactions. AIMF is liable for 78% of the Anson Funds' short-swing profits and AEMF is liable for 22% of the Anson Funds' short-swing profits, each representing their respective participation in the trades set forth in **Exhibits 7** and **8**.

**IN THE ALTERNATIVE, AS AND FOR A**
**SECOND CLAIM FOR RELIEF AGAINST AIMF**

105. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 104, *supra*, as if fully set forth herein.

106. AIMF was a greater than 10% beneficial owner of SELLAS Common Stock during the Short-Swing Profit Transaction Set 2 (¶¶ 94-96 and **Exhibit 8**) and during the Short-Swing Profit Transaction Set 1 (¶¶ 90-93 and **Exhibit 7**) excluding the Block A sales.

107. As particularized in paragraphs 56-73 and 89-99, *supra*, AIMF engaged in purchase and sale transactions in the Company's Common Stock and related derivative securities

resulting in disgorgeable short-swing profits for Short-Swing Transaction Set 2 and Short-Swing Transaction Set 1 excluding the Block A sales in the amount of between at least $44,738,932.28 and at least $149,081,405.23.

108. AIMF is liable for its short-swing profits to the extent of its pecuniary interest in the short-swing transactions. AIMF is liable for 78% of the short-swing profits, representing its participation in the trades set forth in **Exhibits 7** and **8**.

**IN THE ALTERNATIVE, AS AND FOR A**
**THIRD CLAIM FOR RELIEF AGAINST AEMF**

109. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108, *supra*, as if fully set forth herein.

110. AEMF was a greater than 10% beneficial owner of SELLAS Common Stock during the Short-Swing Profit Transactions Set 2 (¶¶ 94-96 and **Exhibit 8**) excluding the Block 5 sales and had a direct or indirect pecuniary in the profits derived from its short-swing transactions.

111. As particularized in paragraphs 56-73 and 89-99, *supra*, AEMF engaged in purchase and sale transactions in the Company's Common Stock and related derivative securities resulting in disgorgeable short-swing profits for Short-Swing Profit Transactions Set 2 excluding the Block 5 sales in the amount of between at least $2,912,694.46 and at least $24,542,201.08.

112. AEMF is liable for its short-swing profits to the extent of its pecuniary interest in the short-swing transactions. AEMF is liable for 22% of the short-swing profits, representing its participation in the trades set forth in **Exhibits 8**.

**IN THE ALTERNATIVE, AS AND FOR A FOURTH CLAIM**
**FOR RELIEF AGAINST THE ANSON DEFENDANTS**

113. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 112, *supra*, as if fully set forth herein.

114. At all relevant times, the other Anson Defendants were each greater than 10% beneficial owners of SELLAS Common Stock and had a direct or indirect pecuniary interest in profits realized by the Anson Funds, AIMF, and/or AEMF in the alleged short-swing transactions in the First, Second, and Third Claims.

115. Each of the Anson Defendants is liable to disgorge short-swing profits to the Company to the extent of each of their pecuniary interests, jointly and severally to the extent permitted by law.

**WHEREFORE**, Plaintiff demands judgment in favor of SELLAS and against Defendants for disgorgement of short-swing profits in an amount to be determined at trial, pre-judgment and post-judgment interest, Plaintiff's costs and reasonable attorneys' fees, and such other relief as the Court deems just.

Dated: November 16, 2026

Respectfully submitted,

OSTRAGER CHONG FLAHERTY
& BROITMAN P.C.

By: /s/ Glenn Ostrager
Glenn F. Ostrager
Joshua S. Broitman
Roberto L. Gomez

437 Madison Avenue, 24th Fl.
New York, New York 10022-7035
Tel.: (212) 681-0600
Fax: (212) 681-0300
E-Mail: *gostrager@ocfblaw.com*

*Attorneys for Plaintiff*